Stockholders Publishing Company, Inc. v. Commissioner.
Stockholders Publ. Co. v. Commissioner
Docket No. 2664.
United States Tax Court
1946 Tax Ct. Memo LEXIS 176; 5 T.C.M. (CCH) 444; T.C.M. (RIA) 46127; May 29, 1946
*176 In 1935 petitioner and its wholly owned subsidiary jointly executed a promissory note given as part consideration for 6,200 shares of stock. In 1936, petitioner dissolved the subsidiary and took over the stock which was its sole asset. During the taxable years petitioner paid the installments due on the note and deducted them as bad debts on its income tax returns. Held: no debtor-creditor relationship existed between petitioner and its wholly owned subsidiary during the taxable years and petitioner is not entitled to deduct the annual payments as bad debts or as an addition to its reserve for bad debts. James A. Caster, Esq., for the petitioner. T. M. Mather, Esq., for the respondent. ARNOLD Memorandum Findings of Fact and Opinion ARNOLD, Judge: The respondent determined income tax deficiencies for the taxable *177 years as follows: 1937 - $5,576.10; 1938 - $4,941.15; 1939 - $1,789.50; 1940 - $138.51. The deficiencies result primarily from respondent's refusal to allow as deductions under section 23 of the applicable revenue acts and the Internal Revenue Code certain installment payments on a promissory note. Part of the deficiencies for 1938 and 1939 resulted from the denial of deductions of amounts reserved for rebates, which adjustments are now conceded by petitioner. Respondent's adjustments with respect to the payments on the promissory note are challenged by petitioner. Findings of Fact Petitioner is a Nevada corporation with its principal office in Los Angeles, California. During the taxable years it owned and operated the Daily News, a newspaper published in Los Angeles. Its income tax returns were filed with the collector for the sixth district at Los Angeles. Its books were kept and its returns filed on the accrual basis. It used the reserve method of charging off bad debts. In January 1935, Signal Publishing Corporation, hereinafter referred to as Signal, was engaged in publishing a daily newspaper, the Huntington Park Signal. All of the capital stock of Signal was owned by petitioner. *178 The officers of petitioner held the same offices in Signal. The Post Publishing Company, hereinafter referred to as Post, was engaged in publishing a daily newspaper in Los Angeles, known as the Record. In 1935 Post had 8,200 shares of capital stock outstanding. In January 1935, the Daily News was a morning paper, the third morning paper in a three-paper field, and a very bad third. The Post's Record was the second afternoon paper in a two-paper field, and a very weak second. Petitioner was apprehensive that some strong newspaper interest might acquire the Post franchise and bring such strong competition into the field that the Daily News would eventually be forced out of business. Accordingly, negotiations were begun for the purpose of acquiring the operation and management of the Post Record. Petitioner's board of directors at a special meeting on January 5, 1935, adopted a resolution which, after reciting petitioner's ownership of all the stock of Signal, reads as follows: And whereas, negotiations are pending between one LeRoy Sanders on the one hand, and this corporation and the Signal Co. on the other hand, under which it is proposed in part that said Sanders shall transfer *179 to the Signal Co. 6,200 shares of the capital stock of the Post Publishing Company, a California corporation, and shall receive in consideration thereof a transfer of all of the assets and good will of the Signal Co., together with the note of this Company and the Signal Co. in the following form: $75,000.00 Los Angeles, California. January 5th, 1935. For value received, the undersigned STOCKHOLDERS PUBLISHING COMPANY a Nevada corporation, and SIGNAL PUBLISHING CORPORATION, a California corporation, do and each of them does hereby jointly and severally promise to pay to LEROY SANDERS the principal sum of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00), together with interest thereon from the date hereof until paid at the rate of six per cent per annum, payment thereof to be made in weekly installments of Four Hundred Dollars ($400.00) each and at times as follows, to-wit: Four hundred dollars ($400.00) on Tuesday, the 15th day of January, 1935, and a like sum of Four Hundred Dollars ($400.00) on each and every Tuesday thereafter until the entire sum of principal and interest has been paid in full. Each payment as made shall be credited first upon accrued and unpaid interest, *180 and the balance upon principal. Principal and interest shall be payable in lawful money of the United States to the payee at Los Angeles, California. Should the makers fail to pay any of said installments within days after same becomes due, the payee shall have the right to, and may at his option, declare immediately due and payable the entire unpaid part of the principal and interest. In the event of a default upon this note and in the event that the payee should institute an action for the collection of the same or any unpaid part thereof, then and in that event the makers agree to pay to the payee a reasonable sum to be fixed by the court for payee's attorneys' fees. The makers reserve and shall have the right to pay the whole and/or any part of this note before maturity. STOCKHOLDERS PUBLISHING COMPANY, INC. By /S/ E. M. BODDY President And /S/ R. I. JONES Secretary SIGNAL PUBLISHING CORPORATION By /S/ E. M. BODDY President And /S/ R. I. JONES Secretary And whereas, this corporation will be benefitted by said transaction and it is in the best interests of this corporation that said proposed transaction be consummated. NOW, THEREFORE, BE IT FURTHER RESOLVED: *181 That as part of the consummation of said proposed transaction the President and Secretary of this corporation be and they are hereby authorized, directed and empowered to execute in the name of and for and on behalf of this corporation along with the Signal Co., a note in the foregoing form and also an instrument in the name of and for and on behalf of this corporation, in such form as they deem proper, consenting to, ratifying and approving a transfer to LeRoy Sanders of all of the assets of the Signal Co., and approving the principal terms of the transaction and the nature and amount of the consideration. The transaction aforementioned was consummated on January 5, 1935. By acquiring the Post stock through Signal petitioner was able to operate in the morning and the afternoon fields and removed a possible source of strong competition. It anticipated building up a strong, prosperous newspaper property. After acquisition of the 6,200 shares of Post stock, payments on the promissory note were made by petitioner but charged to the account of Signal. In 1936 Signal was dissolved and its assets, consisting of the 6,200 shares of Post stock, and its liabilities, consisting of the unpaid *182 balance of the $75,000 note, were acquired by petitioner. At or about the same time petitioner acquired the remaining 2,000 shares of Post stock in consideration for its promissory notes of $93,500 payable over a period of years. At the time petitioner acquired the 2,000 shares of Post stock the latter company was in debt to petitioner for money advanced to meet its operating expenses. Post was unable to operate its business of publishing a newspaper without petitioner's financial assistance. Its net worth in January, 1935, was approximaely $125,000, but at the time Signal was dissolved Post had a large deficit. Among the assets held by Post was a valuable subscription list, and three valuable franchises. In February, 1936, petitioner changed the name of the Post Record to the Evening News, changed the format from an eight column twenty-inch page to that of the Daily News a six column eighteen-inch page, and brought the publication of the two newspapers under one roof. By March 1, 1938, the circulation of the evening paper was up 125 percent since the purchase of the Post Record. Morning circulation was up 35 percent for the same period, and advertising was up 61 percent in the *183 morning paper and 65 percent in the evening paper. In or about September, 1939, the editorial departments and features of both newspapers were consolidated with the best features of each paper published in all editions, eliminating duplication and increasing circulation. On April 1, 1940, the two papers became "The News" operating on a 24-hour basis. During the taxable years petitioner paid installments on the Sander's note in the following aggregate amounts, the final installment being paid in 1940: 1937 - $18,918.38; 1938 - $16,059.30; 1939 - $5,035.14; and 1940 - $740.67. Petitioner deducted the annual payments on the note as bad debts on its income tax return for the taxable years. No part of petitioner's payments on the promissory note during the taxable years constituted a bad debt deductible under section 23 (k) of the Revenue Acts of 1936 and 1938 and the Internal Revenue Code. Opinion Petitioner's argument in this case is premised upon the conclusion that a debtor-creditor relationship existed between it and its wholly owned subsidiary by virtue of its payments on the Sander's note during the taxable years. It is contended that petitioner signed the note purely as *184 an accommodation, and petitioner invokes the principle of law that when one pays a note which he signed as an accommodation for another, a debtor-creditor relationship is created. The fallacy in petitioner's argument starts with the premise. It cannot be said here that petitioner was only secondarily liable on the Sander's note. The minutes of the special meeting of petitioner's board of directors specifically state that the acquisition of the Post stock will benefit petitioner and that it was in the best interests of petitioner that such stock be acquired. The same officers executed the note for petitioner and for Signal. It was intended that Signal would hold the 6,200 shares of stock for petitioner. It was also intended and petitioner did, according to the testimony, make the payments on the note and charged the payments to Signal until it dissolved the latter. When petitioner dissolved its wholly owned subsidiary in 1936 the latter was left without assets and petitioner alone was liable on the note. Under these circumstances we do not think the payments in the taxable years could create a debtor-creditor relationship between petitioner and its previously dissolved subsidiary. *185 An equally cogent reason for denying petitioner's contention is the obvious fact that petitioner sought to acquire the Post stock in order to enter the evening newspaper field in Los Angeles. Regardless of the financial condition of Post in 1935 or when Signal was dissolved the fact remains that petitioner sought control of the Post Record to protect itself from possible competition and to secure the valuable circulation and franchises possessed by Post in the evening newspaper field. Petitioner has retained and used these assets in its newspaper operations. It cannot be said that the cost thereof to petitioner in the taxable years can be deducted as bad debts merely because the acquisition of the stock was handled in the name of its wholly owned subsidiary. In this disposition of the question presented we need not discuss the authorities cited by petitioner relative to its right to increase its annual addition to its bad debt reserve by the amounts paid on the promissory note. Decision will be entered for the respondent.